1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SERGIO OCTAVIO PENA,

            Petitioner,             No. C 07-2119 PJH

      v.                      **ORDER DENYING PETITION**
                                      **FOR WRIT OF HABEAS CORPUS**
JAMES E. TILTON,

            Respondent.
_____/

      Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254, filed by state prisoner, Sergio Octavio Pena ("Pena").  Having reviewed the parties'
papers, and having carefully considered their arguments, the record, and the relevant legal
authorities, the court hereby DENIES the petition.

**BACKGROUND**

**A.**    **Procedural Background**

      On November 21, 2001, Pena was charged along with codefendant Adam Gabriel
Garcia with the first degree murder of Anthony Tolua under California Penal Code § 187,
along with the special allegations that Pena personally used a deadly weapon within the
meaning of § 12022(b) and that he personally inflicted great bodily harm under § 1203.075.

      After a joint trial, on June 5, 2003, a San Mateo County Superior Court jury
convicted both Pena and Garcia of second degree murder.  The trial court sentenced Pena
to fifteen years to life in prison and a consecutive one-year term on the special allegations.[1]
Pena unsuccessfully appealed his conviction to the California Court of Appeal, and the

--------

      [1]Garcia received an identical sentence.

United States District Court

For the Northern District of California

1　California Supreme Court denied review on January 18, 2006.  Pena subsequently filed a

2　habeas petition in the state superior court on April 16, 2007, the same day that he filed his

3　federal habeas petition with this court.  On April 23, 2007, this court stayed and

4　administratively closed the case so that Pena could exhaust his claims in state court.

5　　　　On June 1, 2007, the state superior court denied Pena's habeas petition.  The

6　California Court of Appeal subsequently denied habeas relief on September 7, 2007, and

7　the California Supreme Court also denied relief on May 14, 2008.  On June 13, 2008, Pena

8　filed an application to reopen this case and an amended petition for writ of habeas corpus,

9　as required by the court's April 23, 2007 order.  The court reopened the case, and it was

10　fully briefed on October 2, 2008.

11　**B.　Factual Background**

12　　　　On April 7, 2001, twenty-one year-old Vanessa Ramirez, and her friends, including

13　the victim Anthony "Tony" Tolua, threw a party at Ramirez's parents' house in San Carlos,

14　California while Ramirez's parents were out of town.  At least twenty people attended the

15　party.  Most of the people who attended the party were Ramirez's friends.  However, two of

16　Ramirez's friends, Claudia Ayerdis and Cheyanne Morris, invited two guys from San Jose,

17　Jared Mulic and Mike Brito.  Brito and Mulic brought along Pena and Garcia, in addition to

18　Thong Phan and Jose (Junior) Ponce, also from San Jose (referred to as the "San Jose

19　group").  Ramirez did not know any of the San Jose group, but allowed them to stay at the

20　party.

21　　　　At around 1:00 a.m. on April 8, 2001, Ramirez became upset when someone broke

22　a vase.  Afterward, her friend, Tolua, at Ramirez's request, went through Ramirez's house

23　and began ordering people to leave.  Pena and his friends were in Ramirez's kitchen at the

24　time and exchanged angry words with Tolua.  Several witnesses overheard shouting

25　regarding "San Jose" and "San Francisco," among other phrases, and recalled Pena and

26　his friends "talking shit," and asserting that they were not going to leave Ramirez's house

27　because it was their party.  A fight subsequently broke out in the kitchen, and Tolua was

28

2

United States District Court

For the Northern District of California

1  stabbed three times in his chest.  The autopsy revealed that the stab wounds were caused

2  by two different knives.  One of the wounds entered his heart, and Tolua died from massive

3  bleeding.

4         None of the witnesses had a clear view of the entire fight, and there were

5  discrepancies among the approximately twenty eyewitnesses from the party who testified at

6  trial.  Apparently there were numerous people in the kitchen and the surrounding area at

7  the time, and it was difficult for witnesses to ascertain exactly what had happened.

8  Witnesses recalled that Pena and Garcia were the largest of the six males from San Jose.

9  They observed Tolua and another one of his friends fighting with Pena and Garcia.  None

10  of the witnesses observed Tolua with a weapon, although some saw him throwing punches.

11  Some witnesses recalled a beer bottle being thrown in the air.  Witnesses also observed

12  Pena and Garcia holding knives at the time that Tolua was stabbed.   One witness testified

13  that he observed Pena holding a knife with the blade up a few feet from Tolua.  The witness

14  looked away for a matter of seconds, and when the witness looked back, Tolua had been

15  stabbed.  Another witness observed Tolua throw one punch and then grab his stomach and

16  fall, after which Pena, who was holding a knife, left the kitchen.

17         Tolua died at Ramirez's house, and Pena and the rest of the San Jose group left the

18  house immediately before the police arrived.  The police subsequently found Tolua's blood

19  on Garcia's clothing and in the two cars that members of the San Jose group used to leave

20  the party.  The officers also recovered two bloody knives from Ramirez's kitchen at

21  separate locations within blocks of the house.  The blood on the knives matched Tolua's.

22         After their arrests, both Pena and Garcia identified themselves to officers as

23  "Norteno" gang members.  At the time of his arrest, Pena was wearing a t-shirt that read

24  "South Side San Jose" and red shorts.  He had a tattoo on his right arm that bore an image

25  of a knife intertwined with an "S" and a "J," and also had a tattoo on his chest that stated

26  "out to party mob" in an old-fashioned English font that matched the font on his t-shirt.

27  Pena was subsequently classified as a Norteno gang member for purposes of his prison

28

3

**United States District Court**
For the Northern District of California

1  classification; however, Garcia protested his classification and it was removed for lack of
2  evidence of his gang participation.

3       As noted, at trial, the state presented eyewitness testimony from approximately
4  twenty witnesses who attended the party.  Additionally, the state presented testimony from
5  Carlos Orozco, another Norteno gang member, who was not present at the party but to
6  whom Garcia and Pena spoke immediately after the murder.  After Orozco's arrest on
7  unrelated drug charges, Orozco advised officers that Garcia and Pena admitted in his
8  presence that they had each stabbed Tolua.  However, at trial, Orozco recanted his earlier
9  statements to police, denying that either Garcia or Pena told him anything about playing a
10 role in Tolua's death.

11      The prosecution also presented expert testimony from a San Jose Police
12 Department ("SJPD") officer regarding Hispanic gangs in San Jose.  Although neither Pena
13 nor Garcia were charged with gang enhancement allegations, the state argued that the
14 testimony was relevant to the defendants' motive and intent, particularly to any arguments
15 that the defendants acted in self-defense or under mitigating circumstances.

16      In his defense, Pena called to testify an officer who participated in Orozco's arrest,
17 and also called an officer who interviewed some of the party guests.  He presented his own
18 expert witness who testified regarding changes in memory, particularly regarding adverse
19 trial witnesses whose trial testimony was more definitive than the witnesses' initial
20 statements to police.

21      Garcia did not deny stabbing Tolua, but claimed that it was in self-defense.  Unlike
22 Garcia, though, Pena denied stabbing Tolua.  However, Pena alternatively argued that
23 even if the jury believed he stabbed Tolua, then at a minimum, he acted in self-defense
24 and/or that Tolua must have slipped on the wet floor and fallen into the knife by accident.

**ISSUES**

26 Pena raises three claims for federal habeas relief:

27      (1)    that he was denied due process when the state court admitted gang-related

28

4

United States District Court

For the Northern District of California

1    evidence, including the testimony of a gang expert and evidence regarding

2    Pena's gang affiliation;

3    (2)    that he was denied due process when the state trial court instructed the jury

4        in accordance with the prosecution's "mutual combat" jury instruction, and

5        rejected Pena's related jury instruction which incorporated the defense's

6        theory of the case; and

7    (3)    that he received ineffective assistance from his state appellate counsel when

8        counsel failed to raise the second claim above on direct appeal in the state

9        courts.

10                            **STANDARD OF REVIEW**

11        This court may entertain a petition for writ of habeas corpus "on behalf of a person

12    in custody pursuant to the judgment of a state court only on the ground that he is in custody

13    in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

14    2254(a).  Because the petition in this case was filed after the effective date of the

15    Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act

16    apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district

17    court may not grant a petition challenging a state conviction or sentence on the basis of a

18    claim that was reviewed on the merits in state court unless the state court's adjudication of

19    the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

20    application of, clearly established Federal law, as determined by the Supreme Court of the

21    United States; or (2) resulted in a decision that was based on an unreasonable

22    determination of the facts in light of the evidence presented in the State court proceeding."

23    28 U.S.C. § 2254 (d).

24        A state court decision is "contrary to" Supreme Court authority, falling within the first

25    clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

26    reached by [the Supreme] Court on a question of law or if the state court decided a case

27    differently than [the Supreme] Court has on a set of materially indistinguishable facts."

28

                            5

United States District Court
For the Northern District of California

1  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under §

2  2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

3  the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72

4  (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

5  [Supreme] Court decisions as of the time of the relevant state court decision." *Id.*

6      "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

7  may grant the writ if the state court identifies the correct governing legal principle from [the

8  Supreme] Court's decisions but unreasonably applies that principle to the facts of the

9  prisoner's case." *Id.* at 74.  However, this standard "requires the state court decision to be

10  more than incorrect or erroneous." *Id.*  For the federal court to grant habeas relief, the

11  state court's application of the Supreme Court authority must be "objectively unreasonable."

12  *Id.* at 74-75.  The "objectively unreasonable" standard is different from the "clear error"

13  standard in that "the gloss of clear error fails to give proper deference to state courts by

14  conflating error (even clear error) with unreasonableness." *Id.* at 75; *see also Clark v.

15  Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

16  court, in its independent review of the legal question, is left with a firm conviction that the

17  state court was erroneous . . . Rather, the habeas court must conclude that the state court's

18  application of federal law was objectively unreasonable." *Andrade*, 538 U.S. at 75; *see*

19  *also Clark*, 331 F.3d at 1068.

20      As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

21  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

22  state court resulted in a decision that was based on an unreasonable determination of the

23  facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

24  2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

25  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

26  determining the "unreasonable determination of facts in light of the evidence" under §

27  2254(d)(2). *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

28

**United States District Court**

For the Northern District of California

1   relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

2   determination made by the state court was wrong and that the one [petitioner] urges was

3   correct." *Id.* at 1108.

4          However, when the state court decision does not articulate the rationale for its

5   determination or does not analyze the claim under *federal* constitutional law, a review of

6   that court's application of clearly established federal law is not possible. *See Delgado v.*

7   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a

8   federal court must conduct an independent review of the record and the relevant federal

9   law to determine whether the state court's decision was "contrary to, or involved an

10  unreasonable application of, "clearly established federal law." *Id.* at 982.

11         When a state court does not furnish a basis for its reasoning, we have no
           basis other than the record for knowing whether the state court correctly
12         identified the governing legal principle or was extending the principle into a
           new context. . . .[A]lthough we cannot undertake our review by analyzing the
13         basis for the state court's decision, we can view it through the 'objectively
           reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
14         review is not de novo when the state court does not supply reasoning for its
           decision, but an independent review of the record is required to determine
15         whether the state court clearly erred in its application of controlling federal
           law. . . .  Only by that examination may we determine whether the state
16         court's decision was objectively reasonable.

17  *Id.*

18                               **DISCUSSION**

19  **I.    Admission of Gang-Related Evidence[2]**

20         At trial, an arresting police officer testified that Pena's arm was tattooed with a shark,

21  a woman's head, and a dagger, the blade of which revealed the words "South Side SJ."  As

22  noted, the prosecution also elicited testimony that witnesses to the altercation heard city

23  names shouted during the fight.  It further introduced mug shots of Pena taken the day after

24  the murder when he was arrested and booked, in which he was wearing a t-shirt

25  _____

26         [2]Pena clearly continues to raise this claim in his amended petition.  However, for some
    reason, he failed to brief the issue in conjunction with his amended petition.  Accordingly,
27  Pena's arguments on this issue can be found in his initial petition and accompanying
    memorandum of points and authorities.
28

                                      7

United States District Court

For the Northern District of California

1    emblazoned with "SSSJ" on the front and "South Side San Jose" on the back.

2          Additionally, the state sought to present expert testimony from a San Jose police

3    officer with expertise regarding Hispanic gangs in San Jose.  The state argued before the

4    trial court that the testimony was relevant to Pena's and Garcia's (referred to collectively as

5    "defendants") motive and intent, particularly because defendants were likely to claim that

6    they acted in self-defense or under mitigating circumstances.

7          Pena countered that any gang-related evidence should be excluded because the

8    evidence was not relevant, and was much more prejudicial than probative.  At the pretrial

9    hearing, he contended that it was "bad character evidence . . . . [a]nd the jurors are going to

10   be asked then, to convict [defendants] because they are bad characters, rather than for

11   what they actually did or didn't do."  Garcia similarly argued that there was no evidence of

12   gang activity, that the proposed evidence would confuse the jury, was more prejudicial than

13   probative, was cumulative of other evidence, and could lead to the impermissible inference

14   that he was guilty by virtue of his membership in a gang.

15         After argument, the trial court ruled that, based on the state's offer of proof, it would

16   allow the expert testimony and that any concerns could be dealt with via objections and jury

17   instructions. The court subsequently held a pretrial hearing pursuant to California Evidence

18   Code section 402 to review the expert's testimony. The court found the expert to be

19   qualified and his opinions admissible.

20         The state's expert, Greg Lombardo, a detective in the San Jose Police Department's

21   Gang Investigation Unit, testified that a gang is "a group of individuals that associate with a

22   common name or symbol or sign, [a]nd they basically go out and commit crimes."  He

23   stated that Norteno gangs associate with the color red and typically wear red clothing, and

24   had started in the last decade to refer to themselves as "South Side San Jose," among

25   other designations.  Lombardo also testified that a person with a tattoo referring to "South

26   Side San Jose" is showing loyalty to that gang, and that he had seen other gang members

27   wearing t-shirts like the one Pena was wearing when he was arrested.

28

United States District Court

For the Northern District of California

Lombardo attested that it is not unusual for gang members to have tattoos like that on Pena's right arm, and that normally, gang members will choose a tattoo of a weapon that is their "weapon of choice." Judging from Pena's tattoo, Lombardo stated that he would assume that Pena's weapon of choice was a knife. He also testified that it is not uncommon for gang members to identify themselves as such to booking deputies so that they are housed in prison with other Norteno gang members.

Lombardo also identified "Out-to-Party," the slogan tattooed on Pena's chest, as referring generally to a "party crew," which is a group of people who get together and have a common name like a gang, but usually intend to just go out and party, meet women, drink, and have a good time. He also testified that a lot of party crews turn to violence and become just like any other typical gang.

The prosecutor asked Lombardo regarding certain conduct that occurred at the San Carlos party as follows:

> Q. Is there a significance - when a gang member is having a disagreement or a confrontation with another individual, is there a significance to that gang member calling out the name of their gang, such as "South Side or San Jose?"
>
> A. Yes, there is.
>
> Q. What's the significance of that?
>
> A. It's important, because gangs thrive on intimidation. That's what they do. Without being able to intimidate people, without being able to scare people, they can't survive. It's important that they yell out their gang name, so that everybody there knows what gang they're with. If they're planning on confronting someone, planning on fighting someone, they want everybody in attendance to know just what gang they're associated with. And they also want people to know they're around there, because the word is going to spread that that particular gang is ruthless, which is only going to increase their reputation.
>
> Q. Does it have an impact on a gang member's prestige within the gang to commit acts of violence?
>
> A. Yes, it does.
>
> Q. How so?
>
> A. In most gangs, you're going to have some people that are just kind of hanger-ons. They're just barely in the gang. Then you're going to have guys

9

that are much harder. A lot of the people fall somewhere in between. . . . [I]n order to move up in prestige and to be feared within the gang, you have to do something. They refer to this as making your bones. You have to go out and do something shocking, something violent, something that the other gang members are going to take a look at and say, this person means business. You're going to have more reputation and people are going to listen to you.

Q. If a gang member is involved in a violent confrontation, is there any significance to the gang member increasing the level of violence by, for example, where a fistfight starts, the gang member arms himself with a deadly weapon, such as a knife, or something of that nature?

A. Yes, there is.

Q. And why is that?

A. That is also important. If you go back to what I said regarding the intimidation factor, you want people to know that, if you confront our gang, that you're going to get something back that you didn't anticipate. You're going to get something back more. If you come at our gang with words, we're going to come back with fists. If you attack with fists, we're going to come back with a knife. It sends a message; don't intimidate our gang. Don't even try to intimidate our gang, because you're going to get it back, and we're just going to up the ante every single time.

Q. Is there significance - we've heard some testimony describing an act by an individual holding his hands up with a knife in one hand, confronting some people. And using the term, what's up, in an angry voice. Can you interpret what - in gang culture, what the significance of that type of conduct is?

A. Yes, I can. Even without a knife, that's a form of confrontation. That is a challenge to fight.  You're showing that, I'm a gang member. You appear to be a gang member, and I'm confronting you.  Essentially, what are you going to do about it.  If you're holding a knife, well, then, that's an exclamation point on what you're trying to say.

Pena argued on direct appeal before the state courts that his due process rights were violated by the admission of the gang-related evidence because it was irrelevant to the charges against him, and that its admission constituted prejudicial error.

The California Court of Appeal issued a lengthy, well-reasoned decision on the issue, holding that the trial court did not abuse its discretion in admitting the evidence, and that the expert testimony was probative for numerous reasons.  First, the court held that the expert testimony regarding the nature of gangs and party crews, the manifestations of gang affiliations among Hispanic gang members in San Jose, including tattoos and red clothing, was probative of Pena's and Garcia's gang affiliation.  Second, the court held that the

United States District Court

For the Northern District of California

testimony was relevant to Pena's and Garcia's motives and intent.  Specifically, the court noted Pena's concession on appeal that "unless he acted in justifiable self-defense and under mitigating circumstances (e.g., unreasonable self-defense, sudden quarrel, heat of passion), whoever killed Tolua acted with malice."  The court found that the "[a]ppellants put the question of malice squarely at issue when they argued self-defense and mitigating circumstances."[3]

It further held that there was sufficient evidence to support the prosecution's theory that the altercation was the result of "gang-related aggression," noting evidence regarding appellants' gang affiliations; their refusal to leave the party; the shouting out of "San Jose" and other phrases by defendants and their friends; defendants' almost immediate display of knives in response to a verbal confrontation; and the "sudden" stabbing of the unarmed victim.

The state court also rejected arguments that the expert testimony was unnecessary to help the jury understand the violent confrontation that occurred that evening, noting that "[n]one of the gang styles and codes that the expert discussed, nor the meanings, [were] apparent to a lay person, making them suitable for expert testimony."  It held that the

---

[3]The state appellate court rejected Pena's assertion before it that he did not raise a self-defense theory at trial.  Specifically, it held that although

> Pena's trial counsel did not expressly argue self-defense in his opening statement, he referred to facts suggesting that there were mitigating circumstances with regard to any fight that Pena might have participated in, such as evidence that there was a lump on the back of Pena's neck (suggesting he had been attacked), that Tolua threw the first punch, and that the people in the kitchen were greatly outnumbered.  In his closing, Pena's trial counsel was more direct, specifically telling the jury that the wound to Tolua's chest from the second knife indicates 'that if somebody was holding a knife, they were holding it in that position, I mean, even in a defensive posture, don't come any closer type thing.'  He went on to state later, 'And also, you were told about, as far as self-defense being the phrase, imminent peril of great bodily injury.  Great bodily injury means significant injury or substantial injury.  I ask you, what kind of injury you think you would have if you got hit in the head with a flying Corona bottle or a broken bottle?'

The court further noted that "Pena's trial counsel went so far as to argue in his closing [argument] that the evidence suggested that Tolua could have slipped on a wet kitchen floor [and fallen] into a knife, thereby implying that Pena did not act with malice in any event."

United States District Court

For the Northern District of California

1   conduct at the party, including the defendants' refusal to leave the party, the shouting of the

2   certain expressions, the defendants' almost immediate display of knives in response to a

3   verbal confrontation, and the sudden stabbing, were "sufficiently unfamiliar to a lay person

4   juror so as to justify" admission of the expert testimony.

5        The state court additionally concluded that the expert testimony was not directed at

6   proving the defendants' conduct, finding that the expert did not express an opinion

7   regarding whether either defendant committed a particular act but instead simply

8   responded to the prosecution's hypothetical questions.  It also held that the expert

9   testimony was not unduly prejudicial, and noted that the testimony was no more

10  inflammatory than the evidence itself that defendants brandished knives and stabbed the

11  victim in response to his demand that they leave the party.

12       The court rejected arguments that the expert testimony constituted improper

13  character evidence, determining that defendants mischaracterized the prosecution's use of

14  the expert testimony.  It held that the expert did not opine regarding the defendants'

15  disposition to commit the crime, but instead testified regarding gang affiliations and

16  activities, including Pena's tattoo, to demonstrate gang affiliation and to help explain Pena's

17  motive in picking up a kitchen knife.  The court further rejected Pena's related arguments

18  regarding the prosecution's closing argument.  It found that the trial court "carefully

19  scrutinize[d]" the gang evidence during pretrial proceedings in accordance with the law.

20       The state court then rejected the defendants' argument that the expert improperly

21  testified on the ultimate issue regarding their mental state and intentions.  It found that the

22  expert "did not address defendants' actions at the party specifically," but instead spoke "to

23  the intentions, motives, and expectations of San Jose Hispanic gang members generally in

24  regard to the hypotheticals described to him by the prosecutor."

25       Finally, the state court concluded that even if the admission of expert testimony was

26  in error, any error was harmless under both federal and state law because "[t]here was

27  overwhelming evidence that each defendant participated in murdering Tolua."  It noted that

28

12

United States District Court

For the Northern District of California

1   in spite of the discrepancies and inconsistencies in the witnesses' testimony at trial,

2   "multiple witnesses saw the defendants in the kitchen during the verbal confrontation and

3   fight," and testified that each of the defendants was "waving a knife in a menacing manner

4   in front of Tolua."  As for Pena, the court noted that "no less than three witnesses" saw him

5   waving a knifed point up near Tolua, and overheard him "talking shit," just seconds before

6   Tolua was stabbed.  It also noted that Tolua's blood was found in the car Pena used to get

7   away, and that an informant, Orozco, told police soon after the murder that Pena admitted

8   to stabbing Tolua in front of him.  The court observed that although there were

9   inconsistencies in some of the witnesses' testimony, none of the discrepancies contradicted

10  the above evidence.  For these reasons, the court held that it was "certain the jury would

11  have found [Pena] guilty even if the expert testimony had been excluded."

12          The California Court of Appeal further held that the defendants' claims of self-

13  defense or mitigation would not have prevailed, even in the absence of the expert

14  testimony.  The court characterized the claims as "frivolous," given the "overwhelming

15  evidence" that the defendants "were the aggressors who provoked and escalated the

16  confrontation."  Finally, the court held that there was also overwhelming evidence of malice

17  given the waving of the knives in the air and the plunging of the knife into Tolua's chest.

18          Pena argues before this court that the admission of the gang evidence, including but

19  not limited to the expert testimony, violated his due process rights because it was not

20  relevant to any material issue.  He contends specifically that the evidence was irrelevant to

21  his state of mind, and that the evidence constituted propensity evidence, was inherently

22  prejudicial, and prevented him from receiving a fair trial.  Pena further asserts that

23  admission of the gang evidence was prejudicial because the evidence of his guilt was not

24  overwhelming.

25          Pena argues that the fact that the jury ultimately acquitted him of first degree murder

26  and deliberated for nine hours demonstrates that the jury believed it was a close case.  He

27  asserts that the error in admitting the evidence was exacerbated by the prosecution's

28

13

United States District Court

For the Northern District of California

1    closing argument and the fact that the error was related to motive.

2         In opposition, the state argues simply that Pena has not indicated which United

3    States Supreme Court precedent the state court failed to follow.  It further asserts that the

4    state court's determination that the admission of the evidence was harmless was correct

5    because the evidence of Pena's guilt was overwhelming and the evidence did not have a

6    substantial influence in determining his guilt.

7         Pena does not address the issue any further in his traverse.

8         A state court's evidentiary ruling is not subject to federal habeas review unless the

9    ruling violates federal law, either by infringing upon a specific federal constitutional or

10   statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed

11   by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*,

12   926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

13   1985).  The due process inquiry in federal habeas cases is whether the admission of

14   evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See*

15   *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990

16   (9th Cir. 1986).  The admission of evidence may violate a petitioner's due process rights

17   only if there are *no* permissible inferences that the jury may draw from the evidence.  *See*

18   *Jammal*, 926 F.2d at 920.  Juries are presumed to follow a court's limiting instructions with

19   respect to the purposes for which evidence is admitted.  *Aguilar v. Alexander*, 125 F.3d

20   815, 820 (9th Cir. 1997).  Additionally, in order to obtain habeas relief on the basis of an

21   evidentiary error, a petitioner must show that the error was one of constitutional dimension

22   and that it was not harmless under *Brecht v. Abrahamson,* 507 U.S. 619 (1993).  In other

23   words, a petitioner is required to show that the error had "a substantial and injurious effect

24   on the verdict."  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507

25   U.S. at 623).

26        The Supreme Court "has not yet made a clear ruling that admission of irrelevant or

27   overtly prejudicial evidence constitutes a due process violation sufficient to warrant

28

**United States District Court**
For the Northern District of California

1   issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding

2   that trial court's admission of irrelevant pornographic materials was "fundamentally unfair"

3   under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly

4   established federal law under § 2254(d)).  It has declined to hold that evidence of other

5   crimes or bad acts "so infused the trial with unfairness as to deny due process of law."

6   *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991) (noting that the Court "express[ed] no

7   opinion on whether a state law would violate the Due Process Clause if it permitted the use

8   of 'prior crimes' evidence to show propensity to commit a charged crime").  Similarly, the

9   Court has left open the question of whether the admission of propensity evidence violates

10  due process.  *Id.*  Based on the Supreme Court's reservation of this issue as an "open

11  question," the Ninth Circuit has held that a petitioner's due process rights concerning the

12  admission of propensity evidence is not clearly established as required by AEDPA.  *Alberni*

13  *v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036,

14  1046 (9th Cir. 2008) (reaffirming *Alberni*); *see also, e.g., Larson v. Palmateer,* 515 F.3d

15  1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of

16  whether using evidence of prior crimes to show propensity for criminal activity could ever

17  violate due process, state court's rejection of claim did not unreasonably apply clearly

18  established federal law).

19      Additionally, federal law, like California law, recognizes that gang testimony may be

20  admitted on any material issue, including bias, motive and identity.  *See United States v.*

21  *Abel*, 469 U.S. 45, 59 (1984) (gang evidence admissible to show bias); *United States v.*

22  *Takahashi*, 205 F.3d 1161, 1164 (9th Cir. 2000) ("[e]vidence of gang affiliation is admissible

23  when it is relevant to a material issue in the case"); *Windham v. Merkel*, 163 F.3d 1092,

24  1103-04 (9th Cir. 1998) (testimony regarding gang behavior was not prejudicial because

25  such evidence demonstrated defendant's potential motive for participating as an

26  accomplice in the alleged crimes); *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir.

27  1995) (holding that gang-affiliation evidence was relevant to the issue of identity); *United*

28

United States District Court
For the Northern District of California

1   *States v. Santiago*, 46 F.3d 885, 889 (9th Cir. 1995) (holding that, under Fed.R.Evid.

2   404(b), evidence relating to gangs is admissible where relevant to motive).[4]   In *Windham*,

3   a case similar to this one, the Ninth Circuit held that the trial court's admission of evidence

4   of the habeas petitioner's association with the Crips gang, including a photo album linking a

5   co-defendant to the gang and "gang expert" police officer testimony, while prejudicial, was

6   important evidence of the petitioner's motive to commit murder.  163 F.3d at 1103-04.  The

7   court therefore concluded that the gang related evidence "was admissible to demonstrate

8   [the petitioner's] motive for participating in the alleged crimes [and] did not violate [his] right

9   to due process."  *Id.* at 1104.

10         Given the limited nature of the gang-related evidence and the related limiting

11  instructions in this case, the court concludes that the trial court's decision to allow the

12  evidence, including the expert testimony, was not fundamentally unfair nor did it violate

13  federal law.  To the extent that the essence of Pena's claim is that admission of the gang

14  evidence was irrelevant and/or inherently prejudicial so as to render his trial fundamentally

15  unfair in violation of due process, as set forth in *Holley*, Pena's claim is foreclosed in light of

16  the fact that there is no clearly established federal law "ruling that admission of irrelevant or

17  overtly prejudicial evidence constitutes a due process violation sufficient to warrant

18  issuance of the writ."  568 F.3d at 1101.  Furthermore, the purpose of the gang-related

19  evidence in Pena's case was similar to that in the *Windham* case, in which the Ninth Circuit

20  held that the admission of gang-related evidence did not violate the habeas petitioner's due

21  process rights.  163 F.3d at 1104.

22         Accordingly, the court concludes that the California Court of Appeal's decision

23  affirming the trial court's admission of the gang evidence did not involve an unreasonable

24  determination of the facts; nor was it an unreasonable application of United States

25  Supreme Court law.  Because the court finds there was no error, it need not reach whether

26  _____

27         [4]The California Supreme Court has similarly held that "in a gang-related case, gang
    evidence is admissible if relevant to motive or identity, so long as its probative value is not
28  outweighed by its prejudicial effect."  *People v. Williams*, 16 Cal.4th 153, 193 (Cal. 1997).

1    any such error was harmless or prejudicial.

2    **II.    Mutual Combat Jury Instruction**

3         Pena argues that he was denied due process when the state trial court instructed

4    the jury in accordance with the form mutual combat jury instruction, and rejected the

5    defense's proposed jury instruction on the issue.

6         **A.    Background**

7         The prosecution asked the trial court to instruct the jury in accordance with the form

8    mutual combat jury instruction, CALJIC 5.56, in effect at the time of trial.  C.T. 780.

9    Garcia's counsel objected that CALJIC 5.56 didn't adequately state the law, and Pena's

10   counsel joined in Garcia's objection.  Garcia conceded that there was sufficient evidence

11   that demonstrated that he and the victim were involved in mutual combat, but argued that

12   the state's mutual combat instruction, which followed the form instruction verbatim, was

13   inadequate because it did not explain the circumstances under which Garcia would *not*

14   have been required to withdraw before claiming self-defense.[5]  He argued that if the jury

15   found that Tolua had escalated the fight from a non-deadly fistfight to a deadly fight by

16   throwing a bottle, then Garcia would not have been required to withdraw in order to claim

17   self-defense.  Specifically, he contended that

18            if there was a mutual combat situation, where two people were fighting with
             fists, and the opponent then takes out a bottle, or some other weapon, I don't
19            think the defendant, at that point, under the law, is or should be required to go
             through the four steps [included in the jury instruction] to withdraw from
20            combat and notify the opponent before being able to defend against that
             escalated level of force going from the fist to the bottle.
21
22   R.T. 3231.

23        The trial court overruled the defense objection and found that the form instruction

24   was a correct statement of the law.  *Id.*

25   _____

26        [5]Since Pena's counsel joined in the objection, presumably Pena's counsel conceded
     the same.  However, as noted, Garcia's and Pena's defenses were somewhat conflicting in
27   that Garcia conceded that he stabbed Tolua, and Pena claimed that he was not involved.
     Accordingly, it would appear that by joining in the objection, Pena was covering his bases in
28   the event the jury did not believe him that he was not involved in the stabbing.

17

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Subsequently, Pena did not raise the issue on direct appeal, but instead raised it for

2   the first time in his habeas petition before the state courts.  He argued that the trial court

3   erred in giving the form instruction, CALJIC 5.56, without modification, and that this error

4   violated his Fifth and Sixth Amendment rights because the jury was not instructed on his

5   theory of defense.

6    In his state habeas petition, Pena's arguments were similar to those made by

7   Garcia's counsel at trial, in which he had joined.  Pena conceded that there was sufficient

8   evidence by which a jury could have found that he and Tolua were engaged in non-deadly

9   combat, but argued that Tolua escalated the confrontation to a deadly one "by attacking

10   with beer bottles," and that Pena would have stabbed Tolua in self-defense.[6]

11    The state superior court, however, did not reach the merits because it concluded

12   that Pena waived the claim when he failed to raise it on direct appeal.  It further rejected

13   Pena's claim that his appellate counsel was ineffective for failing to raise the claim on direct

14   appeal.  Both the California Court of Appeal and the California Supreme Court issued

15   postcard denials.

16    **B.    Procedural Default**

17    A federal court will not review questions of federal law decided by a state court if the

18   decision also rests on a state law ground that is independent of the federal question and

19   adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

20   In the context of direct review by the United States Supreme Court, the "adequate and

21   independent state ground" doctrine goes to jurisdiction; in federal habeas cases, in

22   whatever court, it is a matter of comity and federalism.  *Id.*  The procedural default rule is a

23   specific instance of the more general "adequate and independent state grounds" doctrine.

24   *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994).  In cases in which a state prisoner has

25   defaulted his federal claims in state court pursuant to an independent and adequate state

26   ───────────────

27    [6]Again, the court notes that Pena's primary defense at trial was that he did not stab Tolua.  Thus, in making this argument in his habeas petitions, Pena recognizes that the jury did not believe him that he was not involved in the stabbing.

28

18

**United States District Court**
For the Northern District of California

procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Pena argues that he received ineffective assistance of state appellate counsel, which serves as "cause" to excuse the procedural default in this case. *Id.* at 752-53. Pena contends that his counsel's failure to raise the jury instruction claim on direct appeal fell below an objective standard of reasonableness, and that he was prejudiced by this failure because had his counsel raised the issue, "the case would have been reversed years ago."

In opposition, the state contends that Pena's appellate counsel recognized that his self-defense argument was a secondary defense and that the instant claim was therefore not as strong as his claim that the admission of the gang evidence was in error. It contends that appellate counsel made a tactical decision to pursue the claim that he did.

Pena responded by submitting a declaration from his state appellate counsel, Neil Rosenbaum, with his traverse. Rosenbaum states that he did not make a tactical decision *not* to raise the jury instruction claim. Rosenbaum attests:

> I did not consider the claim and then reject it. The reason I did not make the escalation instruction claim on appeal is that I simply and mistakenly overlooked it.

Rosenbaum Decl. at ¶ 8.

At the outset, the court notes that Pena simply submitted Rosenbaum's declaration but failed to submit a proper request that the record be expanded in accordance with Rule 7 of the Rules Governing Section 2254 Cases.

The requirements of 28 U.S.C. § 2254(e)(2), governing requests for evidentiary hearings, also apply to decisions regarding expansion of the record under Rule 7. *See Cooper-Smith v. Palmateer,* 397 F.3d 1236, 1241 (9th Cir. 2005); *accord Schad v. Ryan*, 606 F.3d 1022, 1052 (9th Cir. 2010). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing unless the

United States District Court
For the Northern District of California

applicant shows that:

(A) the claim relies on–

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and*

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The United States Supreme Court has interpreted the opening paragraph of the section to provide that where a petitioner has indeed exercised diligence to "develop the factual bases" of his claims in state court, the requirements of section 2254(e)(2)(A)& (B) do not apply to his request for an evidentiary hearing, or in this case, to a potential request to expand the record. *Williams v. Taylor*, 529 U.S. 420, 435 (2000); *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).  In other words, a petitioner who has exercised such diligence will be taken out of the purview of section 2254(e)(2).  *Griffey v. Williams*, 345 F.3d 1058 (9th Cir. 2003), *vacated on other grounds as moot*, 349 F.3d 1157 (9th Cir. 2003) (petitioner died); *Williams*, 529 U.S. at 430 (showing under 2254(e)(2) "applies only to prisoners who have 'failed to develop the factual basis of a claim in state court proceedings'").  Diligence "depends upon whether petitioner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Cooper-Smith*, 397 F.3d at 1241 (quoting *Williams*, 529 U.S. at 435).

Because there is no request to expand the record, there is also no explanation from Pena regarding why he failed to submit Rosenbaum's declaration with his state court habeas petition, giving rise to a question regarding his diligence in developing the record before the state courts in his habeas proceedings there.

However, the court need not resolve (1) whether Pena's appellate counsel's alleged ineffective assistance provides cause for his procedural default, or (2) whether the record

20

United States District Court

For the Northern District of California

1 should be expanded to include Rosenbaum's declaration.  That is because the court

2 concludes for the reasons below that assuming there was cause for the procedural default,

3 and even if the court were to consider Rosenbaum's declaration in conjunction with this

4 habeas petition, Pena is not entitled to relief on the merits of his jury instruction claim.

**C.    Merits**

**1.    Mutual Combat Jury Instruction and California Law**

The mutual combat jury instruction concerns the right of self-defense applicable to

mutual combatants.  In 2003, the relevant instruction in effect at the time of Pena's trial,

CALJIC 5.56, provided in pertinent part:

> The right of self-defense is only available to a person in mutual combat if he
> has done all of the following:
>
> 1.    He has actually tried, in good faith, to refuse to continue fighting;
>
> 2.    He has clearly informed his opponent that he wants to stop
> fighting;
>
> 3.    He has clearly informed his opponent that he has stopped
> fighting; and
>
> 4.    He has given his opponent the opportunity to stop fighting.
>
> After he has done these four things, he has the right to self-defense if his
> opponent continues to fight.

C.T. 780.

In 2004, after the trial in this case, in *People v. Quach*, the California Court of Appeal

held that the same version of CALJIC No. 5.56 as given at Pena's trial omitted important

information required under the circumstances in that case.  *See Quach*, 116 Cal.App.4th

294, 301-02 (Cal. Ct. App. 2004).  In *Quach*, a group of people, composed of two rival

Asian gangs, emerged from a bar.  *Id.* at 297-98.  An argument broke out between the

defendant, Quach, the apparent leader of one of the gangs, and a member of the rival

gang.  *Id.*  The numerous witnesses failed to agree as to who drew a weapon first, but

nevertheless agreed that shots were exchanged between both men.  *Id.*  There was

testimony that the rival gang member escalated the initial confrontation by pulling or firing a

1    gun, provoking Quach to respond.  *Id.* at 303.  However, other testimony indicated the

2    opposite.  *Id.*

3          The California Court of Appeal found that it was error for the trial court not to instruct

4    the jury concerning an exception for self-defense in the face of a "sudden and perilous"

5    counter assault that permits no opportunity for retreat.  *Id.* at 302-303.  It held that CALJIC

6    No. 5.56 probably misled the jury to believe that the defendant had no right to defend

7    himself.  The court noted that the corollary to the general rule regarding mutual combatants

8    or initial aggressors is that "when a defendant engages in a simple assault and his

9    opponent responds with deadly force so suddenly that the person cannot withdraw, a

10   defendant may immediately use deadly force in self-defense." *Id.* at 301.

11         Following *Quach*, in 2004, CALJIC 5.56 was revised to include optional language

12   regarding the right of self-defense in response to a "sudden and deadly counter assault."

13   The revised instruction added a paragraph providing that:

14         If the other party to the mutual combat responds in a sudden and deadly
           counter assault, that is, force that is excessive under the circumstance, the
15         party victimized by the sudden excessive force need not attempt to withdraw
           and may use reasonably necessary force in self-defense.[7]

16         Thus, where there is evidence that a defendant's adversary responded with sudden

17   and deadly force to a simple assault, the above paragraph provides an exception to the

18   standard rule that a defendant must first retreat or decline combat in order to invoke a claim

19   of self-defense.  *Quach*, 116 Cal.App.4th at 302-03.  It is optional, though, and only "applies

20   when there is evidence that the defendant's adversary responded with a sudden and

21   deadly counterattack and there was no time to decline further fighting or retreat." *Id.*

22                    **2.    Parties' Arguments**

23         In his petition before this court, Pena reiterates the arguments he made in his state

24   habeas petition.  In asserting that California law required the defense jury instruction, Pena

25

26   ─────────────────────

27         [7]On January 1, 2006, California's Jury Instructions ("CALJIC") were replaced by the
     CALCRIM instructions.  CALCRIM 3471 replaced CALJIC 5.56.  The current version of
28   CALCRIM 3471 is similar to the revised CALJIC 5.56.

United States District Court

For the Northern District of California

does not rely on *Quach*, which was decided after the trial in his case, but instead relies on two cases decided prior to *Quach, People v. Sawyer* and *People v. Gleghorn*, both of which the *Quach* court itself relied on.  *Quach*, 116 Cal.App.4th at 302 (citing *Sawyer*, 256 Cal.App.2d 66, 75 (Cal. Ct. App. 1967); *Gleghorn*, 193 Cal App.3d 196, 201 (Cal. Ct. App. 1987)).  Pena argues that based on California law that has existed "for more than a century," an initial aggressor or person involved in non-deadly combat need not withdraw before using deadly force in self-defense where the other party suddenly escalates a non-deadly confrontation into a deadly one.

Pena acknowledges that the trial court gave the general self-defense instruction that advised the jury that when a person "not engaged in mutual combat" is threatened with an attack that justified the right to self-defense, the person need not retreat.  However, Pena argues that the general self-defense instruction did not sufficiently explain the right to self-defense of a person who is the initial aggressor of a non-deadly assault or who is engaged in non-deadly combat.  Pena contends that the trial court's failure to give the defense instruction was prejudicial because the jury could have found that Tolua escalated the fight from non-deadly to deadly force such that Pena was entitled to use self-defense.

In support of the defense instruction, Pena contends that the evidence at trial demonstrated that:

(1)     when the fistfight among the groups began, no one had a weapon; 10 R.T. 1548; 11 R.T. 1719-1722; 16 R.T. 2672-2674; 17 R.T. 2800;

(2)     sometime after the fistfight began, Tolua or Tolua's friend(s) threw beer bottle(s) at Pena and his friends; 8 R.T. 1259, 1301, 1327-28, 1353; 11 R.T. 1838, 1844; 15 R.T. 2452;

(3)     Pena's friend, Jared Mulic, was hit in the head with a bottle and knocked unconscious; 11 R.T. 1821, 1876-77; and

(4)     Pena and Garcia grabbed kitchen knives off of the kitchen counter after the beer bottle knocked Mulic unconscious; 10 R.T. 1675, 11 R.T. 1724; 14 R.T.

23

**United States District Court**

For the Northern District of California

1       2298; 16 R.T. 2676.

2       Additionally, Pena argues that this court's review of the issue should be *de novo*

3   because the state court refused to reach the merits of the issue.  Pena argues that *de novo*

4   review is required even though the state appellate and supreme court summarily denied the

5   petitions in a postcard denial.

6       The state does not address the standard of review issue in its opposition.  As for the

7   merits, the state asserts that even though the California Court of Appeal did not address

8   the specific issue since it was not raised, its decision is nevertheless helpful.  The state

9   notes that the court found no error in the self-defense jury instructions, and also found that

10  Pena's and Garcia's self-defense "claims were practically frivolous in light of the

11  overwhelming evidence that appellants, rather than leave the party as requested, or at a

12  minimum, decline to fight, were the aggressors who provoked and escalated the

13  confrontation."

14      In his traverse, Pena argues that any instructional error was prejudicial because: (1)

15  the case was "close" given that the jury deliberated for nine hours; (2)  his "entire defense

16  was self-defense;" (3) substantial evidence existed to support his theory; and (4) the other

17  jury instructions failed to address his defense theory.  He asserts he relied on the

18  "escalation doctrine," contending that even though the homicide may have arisen out of

19  mutual combat, he was not required to withdraw from the fight as a prerequisite to arguing

20  self-defense because "Tolua's group" escalated the fight from a non-deadly one to one

21  involving force.  Pena, in fact, contends that "[t]his escalation theory was defense counsel's

22  entire theory of the case," and his "sole defense theory."  He further argues that "the only

23  genuine issue at trial was whether Pena acted in self-defense."

24      As support for his "escalation" defense theory, Pena contends that it was Tolua's

25  group that escalated the fight from a non-deadly battle of words and fistfight to a deadly

26  fight by throwing a beer bottle that left one of Pena's friends unconscious.  R.T. 1821,

27  1876-77.  He also claims that the prosecution "capitalized" on the trial court's refusal to

28

24

1  instruct on the escalation defense when it repeatedly told the jury in closing argument that if

2  it found that Pena and Tolua were engaged in mutual combat at the time of the stabbing,

3  and that Pena had not withdrawn from the fight before the stabbing, Pena was not entitled

4  to use self-defense.  R.T. 3218-19.

5          **3.    Analysis**

6          Claims that a state court erred in interpreting state law are not cognizable on federal

7  habeas review.  *See, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim

8  that state supreme court misapplied state law or departed from its earlier decisions does

9  not provide a ground for habeas relief).  Federal courts generally are bound by a state

10 court's construction of state laws, except when it appears that its interpretation is an

11 obvious subterfuge to evade the consideration of a federal issue.  *See Melugin v. Hames*,

12 38 F.3d 1478, 1487 (9th Cir. 1994) (federal court bound by Alaska Court of Appeals'

13 interpretation and decision that state statute was properly applied to petitioner's conduct;

14 *see also Little*, 449 F.3d at 1083 (petitioner might have been able to show that state

15 supreme court's interpretation and application of state law was constitutional error if it

16 constituted "a fundamental defect which inherently resulted in a complete miscarriage of

17 justice," or "exceptional circumstances where the need for the remedy afforded by the writ

18 of habeas corpus is apparent").

19         Additionally, a state court's "[f]ailure to give [a jury] instruction which might be proper

20 as a matter of state law," by itself, does not merit federal habeas relief.  *Miller v. Stagner*,

21 757 F.2d 988, 993 (9th Cir.1985).  The error must so infect the trial that the defendant was

22 deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*  Moreover, a

23 state trial court's finding that the evidence does not support a particular jury instruction is

24 entitled to a presumption of correctness on federal habeas review.  *Menendez v. Terhune*,

25 422 F.3d 1012, 1029 (9th Cir. 2005).

26         Due process requires that "'criminal defendants be afforded a meaningful

27 opportunity to present a complete defense.'"  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir.

28

United States District Court
For the Northern District of California

25

2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a criminal

defendant is entitled to adequate instructions on the defense theory of the case.  *See*

*Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for

instruction on simple kidnaping where such instruction was supported by the evidence).  A

defendant is entitled to an instruction on his defense theory only "if the theory is legally

cognizable and there is evidence upon which the jury could rationally find for the

defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009).

Due process does not require that an instruction be given unless the evidence

supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, at

1029.  The defendant is not entitled to have jury instructions raised in his or her precise

terms where the given instructions adequately embody the defense theory, *United States v.*

*Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035,

1040 (9th Cir. 1979), nor to an instruction embodying the defense theory if the evidence

does not support it, *Menendez*, 422 F.3d at 1029.

Whether a constitutional violation has occurred will depend upon the evidence in the

case and the overall instructions given to the jury.  *See Duckett v. Godinez*, 67 F.3d 734,

745 (9th Cir. 1995).  An examination of the record is required to see precisely what was

given and what was refused and whether the given instructions adequately embodied the

defendant's theory. *Tsinnijinnie*, 601 F.2d at 1040.  In other words, it allows a

determination of whether what was given was so prejudicial as to infect the entire trial and

so deny due process.  *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of

the law.  *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v.*

*Kibbe*, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure

to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*,

111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The significance

of the omission of such an instruction may be evaluated by comparison with the instructions

United States District Court
For the Northern District of California

1   that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting

2   *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case

3   where petitioner demonstrated that application of the wrong statute at his sentencing

4   infected the proceeding with the jury's potential confusion regarding its discretion to impose

5   a life or death sentence).

6       Initially, the court notes that there is an issue regarding whether the defense

7   instruction was even appropriate and/or required under state law.  As noted, the trial court

8   gave verbatim the form mutual combat jury instruction in effect at the time of the trial, and

9   the *Quach* case, which gave rise to the revised form instruction that incorporated the

10  language proposed by defendants, had not yet been decided at the time of Pena's trial.

11      Pena however argues that prior to *Quach,* state law required the defense instruction.

12  In *Quach*, the state appellate court indeed noted that the mutual combat instructional issue

13  had arisen in similar cases in prior years. 116 Cal.App.4th at 302.  In fact, the *Quach* court

14  recognized that "the [issue] seems to pop up every couple of decades."  *Id.*  Citing to

15  *Sawyer*, the *Quach* court noted:

16      [The issue] was raised almost 40 years ago, and an alert trial judge avoided
        the problem by amending an earlier version of the CALJIC instruction on this
17      point, CALJIC No. 623, to include this very concept. His instruction, approved
        by the appellate court, provided, "Where a person seeks or induces a quarrel
18      which leads to the necessity in his own defense of using force against his
        adversary, the right to stand his ground and thus defend himself is not
19      immediately available to him, but, instead he must first decline to carry on the
        affray, must honestly endeavor to escape from it, and must fairly and clearly
20      inform his adversary of his desire for peace and of his abandonment of the
        contest unless the attack is so sudden and perilous that he cannot withdraw."
21
    *Id.* (citing 256 Cal.App.2d at 75 n.2); *see also id.* (noting that the issue "came up again in
22
    1987 in *Gleghorn*, 193 Cal App.3d at 201, and was solved in virtually identical fashion").
23
        The *Quach* court then suggested that the form jury instructions in that case should
24
    have incorporated the language utilized by the court years before in *Sawyer.*
25
        It is certainly not our intention to cast aspersions on the fine work of the
26      Committee on Standard Jury Instructions, Criminal, which deserves the
        gratitude and admiration of the entire criminal bar, but it does appear that the
27      *Sawyer* and *Gleghorn* holdings represent that exquisitely rare, tiny - but
        occasionally (very occasionally; once every 20 years) material - part of the
28

United States District Court

For the Northern District of California

1    law which was omitted from the instruction. While the CALJIC instructions
2    have sometimes struggled to make intelligible to laypersons the difficult
     concepts of law involved, they have very rarely gotten the law itself wrong.
3    The extraordinarily high quality of the committee's work in that regard
     probably explains the trial court's reasonable assumption here that the
4    standard CALJIC instructions would be all that was necessary - an
     assumption appellate courts have generally urged upon bench and bar rather
5    strenuously. Thus, there was no addition here of an instruction such as the
     one approved in *Gleghorn*, [], which told the jury, "[W]here the counter assault
6    is so sudden and perilous that no opportunity be given to decline further to
     fight and he cannot retreat with safety he is justified in slaying in self-defense.
7    . . . " The jury in this case was not so instructed [because] CALJIC No. 5.56
     does not contain such an instruction.

8    *Id.* at 302-303.

9        Accordingly, based on the above, it appears that Pena is correct that California

10   courts had recognized prior to *Quach*, and at the time of Pena's trial, that when the

11   evidence suggests that "a defendant engage[d] in a simple assault and his opponent

12   respond[ed] with deadly force so suddenly that the [defendant could] not withdraw, a

13   defendant may immediately use deadly force in self defense." *Quach*, 116 Cal.App.4th at

14   302. However, that does not necessarily mean that the trial court in this case would have

15   been required to instruct the jury in accordance with that language. Instead, the trial court

16   would only have been required to give the instruction with the language proposed by the

17   defendants if the evidence in the case warranted such an instruction. Moreover, even if the

18   trial court's failure to instruct the jury in accordance with the *Quach* case was incorrect

19   under state law, that does not warrant federal habeas relief.

20       This court agrees with several other district courts that have dealt with the same

21   issue recently. All of those courts concluded on federal habeas review that the trial court's

22   failure to include the same language at issue here in a mutual combat jury instruction did

23   not violate the petitioners' due process rights. *See Stone v. Hedgpeth*, 2010 WL 147948 at

24   *14-15 (N.D. Cal. 2010); *Espinoza v. Walker*, 2009 WL 3681683 at *3-7 (N.D. Cal. 2009);

25   *San Nicolas v. Dexter*, 2009 WL 1651621 at *33-38 (C.D. Cal. 2009).

26       In *Dexter*, one of the petitioner's friends, who was in the same gang as the

27   petitioner, exchanged words with a rival gang member outside a drugstore. 2009 WL

28

                                        28

1651621 at *2-13. The friend subsequently called petitioner, inquiring whether he could arrange a fight between the friend and the rival gang member. *Id.* Petitioner drove over to his friend's house, picked up his friend and two other fellow gang members, and then drove over to the neighborhood where the rival gang was known to hang out. *Id.* Petitioner showed his friend a gun that was in the compartment of the car door. *Id.*

Once in the neighborhood of the rival gang, petitioner's friend flashed a gang hand signal at a group of people who were standing in the street. *Id.* Petitioner drove his car slowly down the street, which ended with a cul-de-sac, and then turned the car around. *Id.* Some men emerged from in between parked cars and joined the other men standing in the street. *Id.* One of the men appeared to be holding a crow bar.

The petitioner stopped the car, and he and his friends got out of the vehicle. *Id.* The petitioner carried his gun in his hand, and one of his friends threw an unopened can of beer at the other men. *Id.* The men approached the car, with fists up. *Id.* Several gunshots were fired, and the other men retreated to the alley. *Id.* Petitioner and his friends jumped back in the car and began to drive away when someone threw a metal disk-like object at the car. *Id.* One of the petitioner's friends fired his gun from the car in the direction of the men in the alley, killing the victim. *Id.*

The petitioner, who was convicted of second-degree murder and possession of a firearm, argued that he was entitled to the same instruction as the *Quach* defendant, claiming that the victim was murdered only after petitioner and his friends were ambushed by the victim and his friends, who they claimed were dangerous and armed. *Id.* On federal habeas review, the district court found that the state appellate court's decision that the case was factually distinguishable from *Quach* was reasonable. *Id.* at *14-16. It upheld the state appellate court's determination that "nothing in the record" supported the petitioner's characterization of the evidence, and noted that the petitioner and his codefendant carried guns from the outset. *Id.* It further noted that the state court was correct that unlike *Quach,* there was no evidence of a "sudden, perilous, and extreme counter assault by the victims,"

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    but that in fact, the victims' reaction appeared to be a defensive response, and that the

2    petitioner and his friends' actions did not represent "a mere simple assault." *Id.*

3        The *Dexter* court, however, alternatively concluded that even assuming the

4    instructional error presented a cognizable federal claim of constitutional magnitude, the

5    petitioner was unable to demonstrate actual prejudice as a result of the omission of the

6    instruction. *Id.* Specifically, the district court noted witnesses' testimony that suggested

7    that the victim and his friends neither ambushed the petitioner's car nor responded with a

8    sudden and deadly counter assault. *Id.* The victim and his friends were at most holding

9    metal objects down by their sides, one of which was a crowbar, but were not armed with

10   guns.  It was only as the petitioner and his codefendant drove away down the street that

11   the victim or his friends threw a metal wheel spacer at the petitioner's car.  *Id.*

12   Furthermore, although the petitioner testified that he heard gunshots, the district court

13   noted that he admitted that occurred only after the victim and his friends began to retreat

14   from the petitioner's car.  *Id.*  The *Dexter* court thus found that the petitioner was unable to

15   demonstrate that omission of the jury instruction had a substantial and injurious effect on

16   the jury's verdict.  *Id.*

17       Like *Dexter*, the petitioner in *Espinoza*, who was convicted of murder, argued that he

18   was also entitled to a *Quach* instruction.  2009 WL 3681683 at *4.  The petitioner and the

19   victim were both gang members in rival gangs, and the petitioner stabbed the victim to

20   death following a verbal exchange on a bus.  *Id.* at *1-2.  Most of the witnesses testified

21   that when the petitioner attacked and stabbed the victim, the victim did not have a knife in

22   his hand.  *Id.*  However, one witness appeared to have testified at a preliminary hearing

23   that the victim was indeed holding a knife in his hand at the time.  *Id.*  The preliminary

24   hearing transcripts were not clear, though, and to the extent that the witness testified the

25   victim possessed a knife at the preliminary hearing, he later retracted his testimony at trial.

26   *Id.*

27       The district court upheld under federal habeas standards the state appellate court's

28

**United States District Court**
For the Northern District of California

1    decision rejecting the petitioner's jury instruction claim, noting that regardless of the

2    conflicting testimony about whether the victim held a knife, all of the percipient witnesses

3    agreed that the petitioner had his knife out as he approached the victim, meaning that the

4    altercation, to the extent it constituted "mutual combat," was not escalated by the victim to a

5    sudden and deadly counter assault.  *Id.* at *6.  Applying the presumption of correctness to

6    the state appellate court's findings, the district court held that its decision was not

7    unreasonable.  Accordingly, because the evidence did not support the instruction, the

8    district court held that the *Espinoza* petitioner was not entitled to federal habeas relief, and

9    it did not reach the issue of prejudice.  *Id.* at *7.

10       Similarly, in *Stone*, the petitioner, who was convicted of first degree murder, also

11   claimed that he was entitled to a *Quach* instruction.  2010 WL 147948 at *1-2.  On the night

12   of the murder, the petitioner had gone over to his friend, the codefendant's house.  *Id.* at *1-

13   3.  His friend was a drug dealer and carried a gun.  *Id.*  His friend introduced him to another

14   acquaintance, the victim, who was standing on a nearby street corner.  *Id.*  Both the victim

15   and the petitioner's friend had guns at the time of the introduction.

16       All three retreated to the victim's apartment to smoke marijuana.  *Id.*  After the

17   petitioner and his friend left, the victim emerged from his home and questioned the

18   petitioner and his friend regarding his cigarette lighter, which had gone missing.  *Id.*  The

19   conversation became tense, and the petitioner walked away.  *Id.*  However, concerned for

20   his friend, the petitioner returned with his gun out, and observing a confrontation between

21   his friend and the victim, the petitioner spun the victim around, observing that he had a gun

22   concealed in a cap he was holding in his hand.  *Id.*  The friend grabbed the victim's gun

23   hand to prevent him from shooting the petitioner.  *Id.*  The petitioner then hit the victim in

24   the face with his gun and opened fire, killing him.  *Id.*

25       The petitioner testified that during the entire struggle with the victim, he believed that

26   the victim was about to kill him and that he had to kill the victim in self-defense in order to

27   prevent that from happening.  *Id.* at *3.  He claimed that during the altercation, the victim

28

United States District Court

For the Northern District of California

1  broke free from the petitioner's friend and tried to shoot petitioner more than once.  *Id.* He

2  argued that he shot the victim more than once because his earliest shots didn't seem to

3  affect the victim, and that even after the victim had been shot repeatedly and had fallen

4  down, the victim was still trying to move and get up.  *Id.* The petitioner claimed he then

5  shot the victim in the back of the head to prevent him from getting up and shooting the

6  petitioner and/or the petitioner's friend.

7        The state appellate court recognized that "one possible view of the evidence" was

8  that the petitioner had committed a simple assault by grabbing the victim's shoulder and

9  that the victim responded with deadly force by raising his concealed gun and pointing it at

10  the petitioner, thus entitling the petitioner to the *Quach* instruction.  *Id.* at *15. The state

11  court found any error harmless, though, because the jury had rejected the petitioner's self-

12  defense claim and found that the murder was premeditated, and the court held that this

13  finding demonstrated that the jury had found that at the time of the final, fatal shots, the

14  victim was disabled and the petitioner had lost any right to deadly force.  *Id.*  In denying

15  habeas relief, the district court held that the state court's findings were reasonable.  *Id.*

16        Here, as referenced by the state, even though Pena did not raise this particular jury

17  instruction issue before the California Court of Appeal on direct appeal, the state appellate

18  court made findings that are relevant to the issue.  In concluding that any error in admitting

19  the gang evidence would have been harmless, the California Court of Appeal made findings

20  that undermine Pena's argument here.  It found that:

21      the evidence indicated that [Pena and Garcia] were, at the least, mutual
    combatants who took aggressive action before there was any threat of
22      physical harm.  Rather than leave the party, the evidence indicates [Pena and
    Garcia] encouraged the escalation of an argument into a deadly fight, waving
23      kitchen knives at Tolua before he or anyone else threw a punch or any bottle.
    There was no evidence that Tolua's actions, even if he did start throwing
24      punches first, would support a reasonable belief that he was likely to inflict
    great bodily injury to them or to a third person.  There was no evidence that
25      Tolua held any weapon, or threw or brandished a bottle.  Even if bottles were
    thrown, there was no evidence that [Pena and Garcia] were under sufficient
26      danger to justify killing Tolua.  There was no evidence that  [Pena and
    Garcia], although at the very least mutual combatants, attempted to stop
27      fighting.  The evidence of their aggression also fatally undermines any
    argument that [Pena and Garcia] acted from some mistaken, if unreasonable,

28

United States District Court

For the Northern District of California

1   belief that they faced an imminent peril of life or great bodily injury.

2   Based on this court's own review of the record, it concludes that the state court's

3   findings that:

4   (1)   Pena and Garcia escalated the fight into a deadly one;

5   (2)   there was no evidence Tolua escalated the fight into a deadly one as

6   he did not hold a weapon or brandish a bottle; and

7   (3)   there was no evidence that Pena and Garcia were in sufficient danger

8   to utilize deadly force

9   were *not* unreasonable determinations of the facts in light of the evidence presented before

10  the state courts.  Moreover, there is absolutely nothing to suggest that the state appellate

11  court did not adequately and fully review the record.  However, even if this court were to

12  review the matter *de novo* and decline to afford the state appellate court's findings a

13  presumption of correctness, as Pena advocates, this court's findings would be nearly

14  identical to those made by the state appellate court.

15  Pena has attempted to re-write the trial court record in his habeas briefs.  First,

16  Pena's characterization of his theory of the case at trial is not supported by this court's

17  review of the record.  For purposes of these federal habeas proceedings, Pena has

18  "borrowed" Garcia's defense theory and passed it off as his own.  Significantly, Pena's

19  assertions that his "entire defense was self-defense" and that the "escalation theory" was

20  his "sole defense," are erroneous.  The trial record *and* Pena's state court appellate briefs

21  clearly demonstrate the falsity of these characterizations.

22  Pena's closing argument at trial underscores that his primary defense was that he

23  did not stab Tolua.  R.T. 3188-3205.  As noted, forensic evidence demonstrated that

24  Tolua's stab wounds were actually caused by two different knives, and given the timing of

25  the stab wounds, this meant that two people were responsible for stabbing Tolua.  Garcia

26  conceded that he stabbed Tolua, but Pena maintained throughout trial and during his

27  closing argument that he was not responsible for the wounds caused by the second knife.

28

33

United States District Court
For the Northern District of California

He asserted that there was "zero proof" that he stabbed Tolua, and noted that his fingerprints were not recovered on either of the knives, and that Tolua's blood was not discovered on his clothing or in the precise location of the car he rode in as a passenger after the murder.  Pena also argued that to the extent several witnesses implicated him, they were biased and were better friends with the victim.  Pena even challenged the reliability of the expert forensic evidence that demonstrated that two knives were used in the murder.

Pena's brief on direct appeal before the California Court of Appeal painted a more realistic picture of his defense at trial.  In arguing that the gang evidence was not relevant to self-defense as applied to him, Pena asserted that "[u]nlike Garcia, [he] did not admit stabbing Tolua and claim self-defense."  Exh. C at 42.  Instead, "*his* defense was that someone else stabbed Tolua."  *Id.* (citing R.T. 3191-3194) (portions of Pena's counsel's closing argument at trial).  In conjunction with his challenge to the gang evidence, Pena conceded that had he asserted self-defense, the gang evidence might have been relevant to the defense, but argued that he had not in fact asserted self-defense.  Exh. C at 43.  Pena noted that "the sum total of his counsel's discussion of self-defense" occurred during counsel's closing argument when his counsel argued before the jury:

> And, also you were told about, as far as self-defense being the phrase, imminent peril of great bodily injury.  Great bodily injury means a significant injury or substantial injury.  I ask you, what kind of injury you think you would have if you got hit in the head with a flying Corona bottle or a broken bottle?

Exh. C. at 44 n. 19 (citing R.T. 3204).

As noted, though, the state appellate court rejected Pena's assertion that he did not raise a self-defense theory at trial at all.  *See supra* at 11 n. 3.  Although this court finds the state appellate court findings to be reasonable, it still by no means suggests that self-defense was Pena's "sole" - or even his primary - theory as he suggests before this court.

Additionally, Pena's assertions regarding the testimony and evidence itself are also wrought with mischaracterizations.  The majority of the "facts" that Pena claims the state appellate courts improperly "ignored," constitute *Pena's* interpretations of the evidence,

United States District Court

For the Northern District of California

interpretations that for the most part are either disputed and/or *not* supported by the record, and therefore interpretations that the state appellate courts, like the jury, were entitled to reject.

The court addresses below the "facts" that Pena points to in an effort to demonstrate that he was entitled to the defense's proposed jury instruction in conjunction with its argument that Tolua and his friends escalated the fight from a non-deadly fistfight to a deadly fight.

**i.** "**When the fistfight among the groups began, no one had a weapon**"

In support of this so-called "fact," Pena cites to trial testimony from witnesses at the party, Megan Bundy, Claudia Ayerdis, Robert Dunne, and Mike Zlatunich.  However, none of the cited testimony supports Pena's assertion, and some of the testimony that Pena cites to actually suggests the opposite.

Ayerdis testified that one of the "two big guys" from San Jose (referring to Pena and Garcia) was already waving a knife around at the time there was only shouting taking place.  R.T. 1723-25.  Additionally, other testimony, not cited by Pena, suggested this was the case as well.  Katrina Villafuerte corroborated Ayerdis' account, testifying that prior to the point at which the actual fight broke out, she heard angry voices in the kitchen and observed one of the two "big guys" from San Jose holding a knife above his head.  R.T. 1648-49.  The trial evidence as a whole demonstrates that, at best, there was a disputed issue regarding whether Garcia and/or Pena held a knife prior to the fistfight.

**ii.** "**Sometime after the fistfight began, Tolua or Tolua's friends threw beer bottles at Pena and his friends**"

Again, at best, the evidence was disputed as to whether one or more beer bottles were thrown; who was responsible for throwing the beer bottle; the target of the bottle; and/or the timing.  In support of his characterization, Pena has cited to testimony from witnesses Vanessa Ramirez, Bill Martinez, Thong Phan, and Faramez Maleki.

United States District Court

For the Northern District of California

1    Maleki observed a beer bottle in the air, but did not testify regarding who threw the

2 beer bottle, when it was thrown, or the target of the beer bottle.  R.T. 2452-54.  Ramirez

3 testified that she was walking through the kitchen and thought she remembered seeing

4 some glass thrown.  She did not testify regarding who threw the "glass."  R.T. 1238.

5 Similarly, Phan testified that he heard glass breaking, but that he did not observe any

6 bottles in the air, but "felt like" a bottle must be flying based on the sound of breaking glass.

7 R.T. 1844.  Unlike the other three witnesses, Martinez testified that he observed a beer

8 bottle thrown in the direction of the San Jose guys (Pena and his friends).  R.T. 1324-28.

9 Martinez attested that the beer bottle ended up breaking the kitchen window.  *Id.*

10    Several other witnesses, though, never observed a beer bottle thrown.

11         **iii.    "Pena's friend, Jared Mulic, was hit in the head with a bottle and**

12                **knocked unconscious"**

13    Pena cites to Phan's and Mulic's testimony.  Phan testified that he heard that Mulic

14 had a cut on his head, but that he did not actually see the cut.  R.T. 1821.  Phan did not

15 testify that the cut was caused by a beer bottle or that he observed Mulic get hit in the head

16 with a beer bottle.

17    Pena also cites to Mulic's testimony.  On direct examination, Mulic testified that he

18 got hit in the head with something, and that he presumed it was a beer bottle.  R.T. 1883.

19 He stated that he was knocked unconscious "for whatever amount of time it was," and then

20 woke up on the kitchen floor and ran out of the house.  Mulic further testified that he didn't

21 realize that he had a head injury until the next day.  On cross-examination, Mulic admitted

22 to punching people during the altercation, but claimed that his head injury couldn't have

23 been caused by a retaliatory punch.

24    In its closing argument, the prosecution rebutted any suggestion that Mulic had been

25 hit and/or knocked unconscious by a beer bottle.  It noted that given the scuffle and fight in

26 the kitchen, it was not credible that Mulic was knocked unconscious and then woke up

27 several moments later unscathed.   R.T. 3216.

28

United States District Court

For the Northern District of California

1

2

### iv.    "Pena and Garcia grabbed kitchen knives off of the kitchen counter after the beer bottle knocked Mulic unconscious"

3      As discussed above, the timing regarding the possession of the weapons, the

4  throwing of a beer bottle, and whether Mulic was knocked unconscious by a bottle, were all

5  disputed.  In support of the above assertion, Pena cites again to trial testimony from

6  Claudia Ayerdis and Robert Dunne, which do not support his characterization.  He also

7  cites to testimony from Villafuerte and Gabe Meyer.  As discussed previously, Villafuerte's

8  testimony actually suggests the opposite.  R.T. 1649.

9      Similarly, Meyer, who identified Pena and Garcia as the two persons who stabbed

10  and killed Tolua, did not testify that Pena and Garcia grabbed the knives *after* a beer bottle

11  rendered Mulic unconscious.  R.T. 2296-97.  Importantly, Meyer did not testify that: (1) a

12  beer bottled knocked Mulic unconscious; or (2) that he observed Pena and Garcia grab the

13  knives after that occurred.  Instead, Meyer testified that by the time he reached the kitchen,

14  there was fighting taking place and that he observed both Pena and Garcia holding knives

15  in their hands, and that it appeared that Tolua was fighting with Pena and Garcia.  R.T.

16  2308-2310.

17      As for Dunne's testimony, Dunne admitted that he did not observe the precise

18  moment when Garcia and Pena picked up the knives, but that he assumed that they were

19  picked up during the fight.  R.T. 2701-2721.  Like the others, Dunne did not testify at all

20  regarding Mulic's alleged injury.

21

22

### v.    "Pena and his friends were getting 'their asses kicked' and were backed into a corner"

23      This "fact" is based on a statement made by Jon Bedoya-Oropeza, one of the

24  victim's friends, to police during their investigation of Tolua's murder.  Bedoya-Oropeza told

25  police that Garcia and his friends were "getting their asses kicked."  He was later called by

26  the prosecution as a witness at trial.

27      On direct, Bedoya-Oropeza testified that he was good friends with the victim's

28

United States District Court

For the Northern District of California

1    brother and that he had known the victim since elementary school.  R.T. 2065-2086.  He

2    stated that he was talking to some friends in the family room when he heard something

3    going on in the kitchen.  *Id.*  Bedoya-Oropeza looked over to the kitchen, and observed

4    Garcia with a knife over his head, waving it from side to side, with the blade pointed up,

5    standing in front of Tolua.  *Id.*

6         Bedoya-Oropeza then observed "fists fly," and keeping his eyes on the knife,

7    testified that he rushed into the kitchen.  R.T. 2076.  Bedoya-Oropeza, however, slipped

8    and fell, and testified that the next thing he observed was Tolua with his head down.  R.T.

9    2067.  Bedoya-Oropeza testified that it appeared that it was approximately "5 on 2,"

10   clarifying that there were approximately five San Jose guys "on" Tolua and Tolua's friend,

11   Maurice.  R.T. 2014.  Garcia knocked Tolua over the head twice with the knife handle, and

12   then Tolua punched Garcia twice.  While Garcia and Tolua were fighting, Bedoya-Oropeza

13   saw Tolua throw a punch, but stop mid-air apparently because he had just been stabbed.

14   R.T. 2077.  Bedoya-Oropeza, however, did not actually observe the stabbing, but saw the

15   blood immediately after it happened.  R.T. 2086.

16        Bedoya-Oropeza was interviewed by officers the night of Tolua's murder, and

17   admitted at trial that he told the officers that Garcia was "getting his ass kicked," and that

18   Tolua was "backing" the San Jose guys into a corner in the kitchen, punching them.  R.T.

19   2124, 2131.  He testified that Tolua and Garcia were backed up to the kitchen sink, and

20   that Garcia hit Tolua over the head with the knife handle because Tolua was punching him.

21   Bedoya-Oropeza, however, admitted that any statement to the police that the "San Jose

22   guys" were "getting their asses kicked" was an exaggeration and a misstatement regarding

23   what was taking place.  R.T. 2154.  He clarified that he meant to say only that Garcia

24   appeared to be "getting his ass kicked" by Tolua.  R.T. 2158.  Although Bedoya-Oropeza

25   observed Pena fighting with Tolua's friend, Maurice, Bedoya-Oropeza couldn't tell whether

26   Pena was getting beaten up by Maurice.  R.T. 2167.

27        In sum, Bedoya-Oropeza's testimony simply does not support the characterization

28

**United States District Court**
For the Northern District of California

1    advocated by Pena.  At best, it was disputed at trial regarding which group was "winning"

2    the fistfight prior to the stabbing.  Significantly, Bedoya-Oropeza's testimony does not

3    suggest that Tolua or Tolua's friends escalated the fight from a non-deadly fistfight to a

4    deadly.  If anything, Bedoya-Oropeza's testimony suggests that it was Garcia and Pena

5    who escalated the fight to its deadly status.

6              **vi.    "Police found beer bottles and broken glass all over the kitchen floor"**

7              Pena asserts that there was evidence that numerous beer bottles were thrown

8    during the fight based on statements from responding officers.  Again, though, this

9    statement is not supported by the record.  The responding officer testified that there was

10   broken glass in the kitchen, but did not testify that it was "all over" the kitchen.  R.T. 1181.

11   Instead, the responding officer testified that the house itself was in an extreme state of

12   disarray, and that there was a large amount of alcohol, and cans and bottles, lying around.

13   He testified that the first thing that he noticed was a young, dead person on the living room

14   floor, lying on his back.  He stated that there was also a large amount of blood on the

15   kitchen and living room floors.

16             The majority of the evidence also suggested that only one beer bottle was thrown,

17   and that that beer bottle hit and shattered the kitchen window.  No one observed Pena's

18   friend, Mulic, being hit by the beer bottle.

19             In sum, although the court is inclined to afford the state court's related findings a

20   presumption of correctness, it does not matter what standard the court applies because it is

21   able to conclude based on a *de novo* review of the record, for the reasons detailed above,

22   that the evidence did not require the trial court to instruct the jury pursuant to the defense's

23   proposed mutual combat instruction.  The record simply does not reveal what Pena would

24   like for it to:  that Tolua and/or Tolua's friends escalated the fight from non-deadly to deadly

25   violence thus entitling Pena to use deadly self-defense.  Accordingly, because it was not

26   supported by the evidence, the trial court's refusal to give the defense instruction did not

27   violate Pena's due process rights, nor did it prevent Pena from presenting his theory of the

28

**United States District Court**

For the Northern District of California

1   case.

2   Moreover, the other jury instructions, including the self-defense instructions, along

3   with the record evidence as a whole, demonstrate that Pena is unable to show actual

4   prejudice as a result of the omission of the defense's proposed language from the mutual

5   combat instruction.  Several witnesses observed Pena with a knife prior to and after the

6   stabbing, including Jared Frias, Gabe Meyer, and Robert Dunne.  R.T. 3137, 3216, 1593-

7   94, 1499-1600, 1609, 3138, 2294-2310, 2334-2338.  No one observed Tolua or Tolua's

8   friends with a weapon.  Additionally, although he later recanted his statements, an

9   informant, Carlos Orozco, who is a member of Pena's gang, gave police statements and

10  details regarding the murder that one would only know from someone involved in the crime.

11  In his statement to police, Orozco stated that he was at another SSSJ gang

12  member's house, Mike Strider, less than twenty-four hours after the murder.  According to

13  Orozco, Pena was there and looked upset and nervous.  Pena eventually started talking

14  about the party, and described how Garcia refused to shake someone's hand at the party.

15  Pena told Orozco that there was a fight and that they were losing, so they pulled out their

16  knives.  Pena admitted stabbing Tolua.  Pena also told Orozco that the knife got thrown out

17  the window of the car, and that Pena had blood on his clothes.

18  In light of the above, there is little, if any, likelihood that the jury's verdict would have

19  been different had it been instructed that "when a defendant engages in a simple assault

20  and his opponent responds with deadly force so suddenly that the person cannot withdraw,

21  a defendant may immediately use deadly force in self-defense."  Accordingly, Pena is not

22  entitled to relief on this claim.

23  **III.    Ineffective Assistance of Appellate Counsel**

24  As noted, Pena also claims that his state appellate counsel was ineffective when he

25  failed to raise the above jury instruction claim on direct appeal.  Although the state courts

26  did not reach the underlying jury instruction claim on the merits, instead finding that Pena

27  had waived the claim, the San Mateo County Superior Court denied the ineffective

28

United States District Court

For the Northern District of California

1   assistance of counsel claim on the merits.  The court found that Pena's counsel raised four

2   other issues on appeal and acted as an "active advocate," suggesting that counsel's

3   performance was not deficient.

4       Claims of ineffective assistance of appellate counsel are reviewed according to the

5   standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Miller v. Keeney*, 882

6   F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).

7   A defendant therefore must show that counsel's advice fell below an objective standard of

8   reasonableness and that there is a reasonable probability that, but for counsel's

9   unprofessional errors, he would have prevailed on appeal.  *Miller*, 882 F.2d at 1434 & n.9

10  (citing *Strickland,* 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

11      It is important to note that appellate counsel does not have a constitutional duty to

12  raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S.

13  745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882

14  F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the

15  hallmarks of effective appellate advocacy.  *See id.* at 1434.  Appellate counsel therefore will

16  frequently remain above an objective standard of competence and have caused his client

17  no prejudice for the same reason – because he declined to raise a weak issue.  *Id.*

18      Although Pena argues otherwise and has submitted a declaration from his appellate

19  counsel, Rosenbaum, in which Rosenbaum states that he "overlooked" the jury instruction

20  issue, the court questions whether that after-the-fact statement is indeed accurate.  Had

21  Rosenbaum raised the jury instruction issue on direct appeal that Pena's federal habeas

22  counsel now raises, that claim would not only have been inconsistent, but would have

23  completely undermined Rosenbaum's arguments regarding the admission of the gang

24  evidence.  As discussed, on direct appeal before the state court, Pena argued that the

25  gang evidence was irrelevant in large part because he had not relied on a self-defense

26  theory at trial.  The instant jury instruction claim clearly advocates the opposite, and in fact,

27  is premised on Pena's (inaccurate) assertion that self-defense was his primary defense

28

United States District Court

For the Northern District of California

1  theory.[8]  For this reason, it is likely that state appellate counsel's failure to raise the issue

2  was indeed strategic or tactical.

3      Nevertheless, even if state appellate counsel's failure to raise the issue could be

4  deemed deficient, it was not prejudicial.  As discussed above, Pena was not entitled to

5  relief on the jury instruction claim, and it is extremely unlikely that he would have prevailed

6  on appeal based on that claim.

7      For these reasons, the state court's decision on the ineffective assistance of

8  appellate counsel claim was not contrary to, or an unreasonable application of, clearly

9  established federal law.

10  **APPEALABILITY**

11      The federal rules governing habeas cases brought by state prisoners require a

12  district court that denies a habeas petition to grant or deny a certificate of appealability

13  ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

14  2254.

15      A petitioner may not appeal a final order in a federal habeas corpus proceeding

16  without first obtaining a certificate of appealability (formerly known as a certificate of

17  probable cause to appeal).  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall

18  grant a certificate of appealability "only if the applicant has made a substantial showing of

19  the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate

20  which issues satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has

21  rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

22  straightforward: the petitioner must demonstrate that reasonable jurists would find the

23  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

24  *McDaniel*, 529 U.S. 473, 484 (2000).

25      Jurists of reason could find the court's ruling on all three issues debatable or wrong.

26  _____

27      [8]The court notes that federal habeas counsel appears to recognize this fact.
   Interestingly, in his arguments before *this* court, Pena has abandoned the argument that the
28  gang evidence was irrelevant because he did not claim self-defense.

1   A COA therefore will be granted as to all three issues.

2                                    **CONCLUSION**

3          For the reasons set forth above, Pena's petition for writ of habeas corpus is

4   DENIED.  This order fully adjudicates this case and terminates all pending motions.  The

5   clerk shall close the file.

6

7   **IT IS SO ORDERED.**

8

9   Dated: November 30, 2010

10  _____

11  PHYLLIS J. HAMILTON
    United States District Judge